No. 63,647

STATE OF KANSAS, *Appellee*, v. LOUIS BEANS, *Appellant*.

(800 P.2d 145)

Opinion filed October 26, 1990.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, and *Thomas H. Johnson*, assistant appellate defender, were on the brief for the appellant.

*Debra Byrd Wagner*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Nola Foulston*, district attorney, were with her on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is a criminal action wherein Louis Beans was convicted by a jury of rape, K.S.A. 21-3502, and aggravated burglary, K.S.A. 21-3716. Beans was sentenced under the habitual criminal act for thirty years to life on the rape charge and five to ten years for aggravated burglary. The sentences are to run consecutively.

The facts of this case are in dispute and therefore are set out in detail.

On the evening of October 19, 1988, G.W. sat outside her apartment visiting with neighbors, Debra Burgess and J.B. Jacques, and a friend, Sir Douglas. G.W. testified that Louis Beans came by with his daughter and agreed to meet Jacques later to buy some beer. When the men returned from purchasing beer, G.W. stated she was across the street at a friend's house. Beans crossed the street and spoke with G.W.'s friend and then left. G.W. stated that when she returned home Beans knocked on the door, came into the living room, and sat on the couch talking. Beans repeatedly made sexual advances to G.W.; which were rejected according to her testimony. However, Beans finally succeeded in touching her breasts and vaginal area through her clothing, against her will. G.W. again demanded that Beans leave.

At this point of the struggle, G.W. stated that Jacques arrived at the door, seeking to borrow an alarm clock. G.W. testified she tried to hint to Jacques that Beans was present and she wanted Beans to leave, but never actually said anything to Jacques about her struggle with Beans. After Jacques left, G.W. testified she moved to the back door in her kitchen and again told Beans to leave. According to G.W., Beans pulled the door shut, grabbed her, and pushed her down to the floor between the refrigerator and stove. The left pocket of G.W.'s pants was torn in the struggle to remove her pants. Prior to vaginal penetration with his penis, Beans grabbed a knife from the kitchen counter and told G.W. to be quiet. G.W. claims her hand was cut in the struggle. G.W. stated that after the rape Beans dressed and as she began to dress someone knocked on the front door. When G.W. opened the front door she heard the back door close as Beans left.

At trial, in response to questions by the State, G.W. admitted a previous conviction for prostitution and stated she had paid a fine and finished her probation.

J.B. Jacques testified at trial that G.W. never said anything to him about getting Beans to leave when he went to her apartment to borrow an alarm clock. Later, however, he said he heard scuffling noises in the kitchen area through the wall between his and G.W.'s apartment. Jacques went outside and found G.W. on the front porch crying.

Officer Schreck stated there was blood and change on the floor in the kitchen area when he arrived at the scene. G.W. had a

small laceration on her finger, and he transported her to the hospital. After the medical examination, Officer Schreck interviewed G.W. G.W. told him that Beans came over to her house and kept trying to touch her. G.W. told Beans to stop and, in an attempt to divert his attention, she told him about a bag outside she believed was filled with money. Beans went outside to retrieve the bag but before G.W. was able to lock the door Beans pushed himself back inside. G.W. told Officer Schreck the fondling began again and a verbal argument ensued. Beans grabbed a knife from the kitchen counter, and G.W. cut her finger as she grabbed for the knife. G.W. said Beans then placed the knife on the counter and the rape occurred.

Louis Beans denies the rape and claims the sexual intercourse with G.W. was consensual. At trial, Beans testified he met the group of friends while helping his daughter with a school fundraiser. He testified G.W. asked him to come back after taking his daughter home and instructed him to park his car around the corner. After returning from the beer purchase with Jacques, Beans said he spoke with G.W. at the friend's house across the street and was told to move his car around the corner and knock on the back door so her friends next door would not know he was there. Beans moved his car around the corner and then knocked on G.W.'s door. G.W. let him in.

Once inside the apartment, Beans stated he and G.W. sat on the couch where they engaged in a friendly talk. G.W. spoke about money problems and told Beans that she liked him. G.W. placed her hand on his thigh and kissed him. When Jacques came to borrow the alarm clock, Beans told him his niece had borrowed his car. Beans denied that either he or G.W. left the apartment to get a bag.

Beans testified G.W. locked the front door behind Jacques and sat down by him on the couch. G.W. began to fondle him and then slid to her knees on the floor directly in front of him. Beans stated that G.W. fondled his penis and they eventually had sexual intercourse on the living room floor. Beans testified that after he dressed, G.W. reached into his pocket for money. The second time she grabbed for money coins fell from his pocket onto the floor. G.W. repeatedly tried to get money out of Beans' pockets. Beans went to the back door to leave and pulled out a knife

which was wedged into the back door. Beans testified he handed the knife to G.W., who cut herself grabbing for it. G.W. grabbed for his pockets once again before he left. Beans denied intending to have sexual intercourse when he entered G.W.'s apartment.

This appeal followed Beans' conviction.

The first issue raised by Beans is that the district court erred in refusing to admit testimony by G.W.'s probation officer. At trial, the State introduced evidence that G.W. had previously been convicted of prostitution. G.W. stated she paid a fine and finished her probation for the offense. Beans did not cross-examine G.W. on this matter but as a trial tactic sought to introduce testimony by G.W.'s probation officer to show G.W. lied when she stated she had paid her fine and completed probation. The district court found the testimony collateral and refused to admit it into evidence.

In light of Beans' defense that the sexual intercourse was consensual, he contends that G.W.'s credibility was a key issue. Thus, he argues, failure to allow into evidence testimony bearing on G.W.'s credibility was prejudicial to Beans.

The State argues that Beans was allowed to present his defense by introducing other evidence bearing on G.W.'s credibility. The State also points out that Beans had the opportunity to cross-examine G.W., but declined to do so. Finally, the State asserts in its brief that failure to admit the testimony was harmless error in light of the other evidence bearing on G.W.'s credibility.

*Dewey v. Funk,* 211 Kan. 54, 505 P.2d 722 (1973), sheds light on the issue presented. In *Dewey,* a paternity action, the trial court refused to allow testimony as to the mother's chastity after she testified she was a virgin prior to the incident giving rise to conception. 211 Kan. at 55. In ruling that the defense's testimony about the mother's prior sexual activities should have been admitted, the court stated:

"[W]hen a party introduces inadmissible and prejudicial evidence, the opposing party may introduce similar evidence 'whenever it is needed for removing an unfair prejudice.' A litigant who draws from his own witness irrelevant testimony which is prejudicial to the opposing litigant ought not to object to its contradiction on the ground of irrelevancy." 211 Kan. at 57.

In *State v. Nixon,* 223 Kan. 788, 576 P.2d 691 (1978), the court was presented with the very issue before us today. The defendant

was charged with rape and aggravated sodomy and based his defense upon consent. 223 Kan. at 789-90. On direct examination the victim answered questions about the use of marijuana. 223 Kan. at 790. Upon cross-examination the victim denied selling drugs and knowing a certain defense witness. 223 Kan. at 791. The defendant sought to introduce testimony by the witness that he had met the victim on three occasions, thereby challenging the truthfulness of the victim's testimony. 223 Kan. at 792. After considering the rules set forth in *Dewey,* the *Nixon* court found error in precluding the defendant from presenting evidence on a collateral issue to cast doubt on the truthfulness of the victim's testimony. 223 Kan. at 794.

In *State v. Davis,* 237 Kan. 155, 697 P.2d 1321 (1985), this court again applied the rules stated in *Dewey* and *Nixon.* In *Davis* we found error in the trial court's exclusion of rebuttal testimony which was offered to show the witness' testimony on collateral matters was false, thereby undermining his credibility. 237 Kan. at 161.

Finally, let us consider *State v. Macomber,* 241 Kan. 154, 734 P.2d 1148 (1987), where the defendant was convicted of aggravated robbery. In *Macomber,* three of the defendant's friends testified that he had admitted committing the robberies. One of the friends, Brian Fairchild, stated on cross-examination that he had never lied on the witness stand before. The defense made a proffer of evidence to impeach Fairchild's credibility. At a preliminary examination, Fairchild stated he was not under the influence of drugs and never used drugs. The defense, however, was able to produce two witnesses who would testify that Fairchild smoked marijuana on the way to the hearing and was involved in various drug transactions. 241 Kan. at 158. We found that Fairchild's testimony regarding the defendant's admission of criminal activity was essential to the State's case. Therefore, it was prejudicial to preclude the defendant from rebutting the testimony. 241 Kan. at 159. See *Whiteley v. OKC Corp.,* 719 F.2d 1051, 1055 (10th Cir. 1983); *State v. Macomber,* 244 Kan. 396, 400-03, 769 P.2d 621 (1989).

The foregoing case law establishes prejudicial error by the trial court. Since the trial court error pertains to the alleged victim's prior sexual conduct, we hasten to point out there was no violation

of K.S.A. 21-3525, the rape-shield statute, under the circumstances of this case. Here the State introduced evidence of previous sexual conduct of the complaining witness. Under such circumstances K.S.A. 21-3525(3) authorizes a defendant to cross-examine such witness and "offer relevant evidence limited specifically to the rebuttal of such evidence or testimony introduced by the prosecutor or given by the complaining witness."

In the present case, consent was the sole issue in dispute concerning the rape charge against Beans. Thus, the truthfulness of G.W.'s testimony was an all-important element in the State's case. Where the State offered testimony by G.W. concerning her prior conviction of prostitution and probation, the trial court erred in refusing to allow rebuttal evidence to show the falsity in her testimony. The credibility of G.W. is the heart of the State's case. It was reversible error for the trial court to refuse to admit the probation officer's testimony.

The State's argument that Beans waived the right to introduce impeachment evidence by failure to cross-examine G.W. concerning her statement on direct examination is without merit. Beans chose the best trial tactic available to him to impeach G.W.'s credibility rather than allow G.W. to embellish or improve upon her statement concerning prior sexual conduct and probation. Beans sought to produce evidence through the testimony of G.W.'s probation officer that G.W. did not tell the truth. Neither K.S.A. 60-420 nor K.S.A. 60-421 limits the defendant's impeachment of a State witness to cross-examination, but on the contrary authorizes the introduction of extrinsic evidence on any matter relevant to credibility.

In view of the foregoing, the other issues raised need not be discussed.

The judgment is reversed, and the case is remanded for a new trial.